**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

CARMEN FLORES CASTRO,

Petitioner,

v.

BERTHA HERNANDEZ RENTERIA,

Respondent.

Case No. 2:18-cv-01739-GMN-CWH

**REPORT AND RECOMMENDATION**

This matter is before the court on petitioner Carmen Castro Flores' verified complaint and petition for the return of the minor child (ECF No. 1), filed on September 7, 2018. Respondent Bertha Hernandez Renteria filed a response (ECF No. 33) on October 31, 2018. The court held an evidentiary hearing on November 9, 2018. (Mins. of Proceedings (ECF No. 46).) At the hearing, the court admitted into evidence petitioner's exhibits 5-7, 10-12, 14, 18-19, 25, 31, 34, 46-47 and respondent's exhibits 6, 9, 17. (*Id.*) The court also considered the parties' post-hearing briefs (ECF Nos. 48, 50, 51), filed on November 14, 2018.

Also before the court are respondent's motions to seal her pre-trial and post-trial briefs (ECF Nos. 42, 49), filed on November 6 and November 14, 2018.

Also before the court is petitioner's emergency motion to strike a part of respondent's post-trial brief (ECF No. 52), filed on November 15, 2018. Respondent filed a response (ECF No. 53) on November 15, 2018, and petitioner replied (ECF No. 54) on November 16, 2018.[1]

I.      **FINDINGS OF FACT**

This is a case brought under the 1980 Hague Convention on Civil Aspects of International Child Abduction ("Hague Convention" or the "Convention"). (Compl. (ECF No. 1).) During the pendency of custody proceedings before the Sixth Judicial Family Court in Jalisco, Mexico,

---

[1] Petitioner's pending motions for sanctions (ECF Nos. 14, 26) will be addressed in a separate report and recommendation.

1  respondent absconded with petitioner's eight-year-old half-sister, Z.M.F.Z. to Las Vegas, Nevada.

2  Petitioner and Z.M.F.Z. are both dual citizens of the United States and Mexico.  Respondent is a

3  citizen of Mexico, and she is the maternal grandmother of Z.M.F.Z.

4        Z.M.F.Z. was born in Clark County, Nevada, on November 23, 2009 to Raul Flores

5  Hernandez, her father, and C. Rusia Michel, her mother.  (Tr. (ECF No. 47) at 70, 137.)

6  Following Z.M.F.Z.'s birth, the family returned to Mexico.  (*Id.* at 70.)  Z.M.F.Z.'s primary

7  caregivers were her mother and respondent, until Z.M.F.Z.'s mother disappeared in April of 2014.

8  (*Id.* at 55, 118.)  Following the disappearance, respondent became Z.M.F.Z.'s primary caregiver,

9  and occasionally Z.M.F.Z. would see petitioner.  (*Id.* at 55.; *see also* Ex. 6 at BHR 000159 (where

10  Z.M.F.Z. describes the disappearance of her mother) (the English translation is available at Ex. 16

11  at BHR000960).)   In 2016, Raul and respondent established an informal custody agreement,

12  permitting respondent custody on weekdays and Raul custody on the weekends.  The informal

13  arrangement continued for 10 months.  (Tr. (ECF No. 47) at 121-122.)  According to respondent's

14  son, Jose Rufo Corona, Raul provided respondent with financial support to care for Z.M.F.Z.  (*Id.*

15  at 110.)

16        Rufo testified to the events leading to petitioner's custody petition with the Mexican

17  family court.  According to Rufo, around April 29, 2017, he was staying with respondent in her

18  home in Guadalajara, Mexico.  (*Id.* at 100.)  That night, while out with friends, Rufo received a

19  call from respondent's husband, Elias, expressing concern for Z.M.F.Z. because respondent was

20  "very mad."  (*Id.*)  Elias stated that he wanted protection for the child and asked Rufo to call

21  petitioner before heading home.  (*Id.*)  Rufo testified that he called petitioner, and that she picked

22  him up with Z.M.F.Z.  (*Id.* at 100-101.)  A few blocks before the trio reached respondent's home,

23  Z.M.F.Z. began to cry.  (*Id.* at 101.)  Once the trio arrived at respondent's home, respondent

24  "completely ignored [Z.M.F.Z.]."  (*Id.*)  Rufo testified he noticed Z.M.F.Z. crying in the living

25  room and when he asked her what was wrong, Z.M.F.Z. stated:

26        You know what, [respondent] kicked me out of the bedroom and told me she
        doesn't love me anymore and told me that she was going to leave me and I was
27        going to be alone and nobody loves me and nobody cares about me . . . .

28

1   (*Id.* at 101-102.)  Rufo spoke to respondent, advising her not to speak to Z.M.F.Z. in that manner

2   considering Z.M.F.Z.'s mother's disappearance.  (*Id.* at 102.)  The next day, Rufo heard

3   respondent yelling at Z.M.F.Z. and using profanity because her television was not working.  (*Id.*)

4   Z.M.F.Z. left respondent's home with petitioner, and Rufo again spoke to respondent and asked

5   her not to speak to Z.M.F.Z. in that manner.  (*Id.* at 103.)  Later that evening, Rufo spoke to Raul

6   and advised him to remove Z.M.F.Z. from respondent's care.  (*Id.* at 103-104.)  Petitioner also

7   testified that Z.M.F.Z. confided in her about the dispute with respondent, and that following their

8   conversation, she discussed the incident with Raul.  (*Id.* at 25.)  Z.M.F.Z. then went to live with

9   Raul.  (Ex. 6 at BHR 000159 (the English translation is available at Ex. 16 at BHR000960).)

10  Following Z.M.F.Z.'s removal from her care, respondent filed a police report alleging that

11  petitioner and Rufo abducted Z.M.F.Z.  (Tr. (ECF No. 47) at 114.)  However, nothing came of

12  respondent's allegations.  (*Id.* at 25.)

13        Raul and petitioner initiated custody proceedings against respondent before a family judge

14  in the Sixth Judicial Court of the State of Jalisco in May of 2017.  (Ex. 19 at Castro 000139.)  The

15  Jalisco family court awarded custody to Raul on May 8, 2017. [2]  (*Id.*)  Following the custody

16  order, Z.M.F.Z. resided with Raul and his wife until he was later arrested.  (Tr. (ECF No. 47) at

17  26, 69, 72, 94, 155.)  Petitioner testified that while Z.M.F.Z. resided with Raul, Z.M.F.Z. spent

18  time with petitioner and her family on the weekends, and on some weekdays.  (*Id.* at 26-27.)  The

19  court admitted into evidence various photographs of Z.M.F.Z. and petitioner's family

20  participating in various outings after May 2017.  (Ex. 32 at Castro 000214, 000251, 000260,

21  000292, 000312; *see also* Tr. (ECF No. 47) at 27-31.)  Petitioner testified that following Raul's

22  arrest, Raul informally gave petitioner custody of Z.M.F.Z.  (Tr. (ECF No. 47) at 72.)  In

23

24

25

26

27

28

_____

[2] The court notes that the parties stipulated to the admission of Exhibit 7, a supposed copy of the Jalisco family court's May 2017 order.  An English translation was not provided to the court.

1  petitioner's verified complaint, petitioner attests under the penalty of perjury that Z.M.F.Z. then

2  resided with her beginning in July of 2017.[3]  (Compl. (ECF No. 1) at 4, ¶ 17.)

3         In 2017, Raul was arrested in Mexico in relation to the United States' Office of Foreign

4  Assets Control's ("OFAC") allegations of drug trafficking.  (Tr. (ECF No. 47) at 67-69.)  In

5  August of 2017, petitioner first learned that her husband, Oscar Armando Jimenez Hernandez,

6  also appears on OFAC's drug trafficking designation list, alongside her father, Raul.  (*Id.*)

7  However, petitioner testified that her husband is not involved in drug trafficking, or her father's

8  business.  (*Id.* at 62, 68.)  Petitioner also testified that she and her husband have never been

9  arrested, and that there are no pending criminal charges against them.  (*Id.* at 32.)

10        During the pendency of the custody proceedings, the Jalisco family court awarded

11 respondent provisional custody rights from August 11, 2017 until August 18, 2017, to allow

12 Z.M.F.Z. to be interviewed by a psychologist.  (Ex. 10 at Castro 000071; Ex. 11 at Castro

13 000075.)  Respondent was ordered to return with Z.M.F.Z. and the psychological report at the

14 hearing scheduled for August 18, 2017.  (Ex. 11 at Castro 000075.)  Respondent appeared at the

15 August 18, 2017 hearing without Z.M.F.Z. and without the report.  (Ex. 12 at Castro 000080.)  As

16 a result, the Jalisco family court continued the hearing until September 8, 2017 to allow

17 respondent to get the report, extended her provisional custody in the meantime, and ordered

18 respondent not to leave the State of Jalisco or Mexico with Z.F.M.Z during the pendency of the

19 proceedings.  (*Id.*; *see also* Ex. 14 at Castro 000097.)

20        On August 30, 2017, petitioner informed the court that respondent had left the country

21 with Z.M.F.Z.  (Ex. 14 at Castro 000097.)  The court issued a warrant for respondent's arrest and

22 issued another order prohibiting respondent from leaving Jalisco, Mexico or the country with

23 Z.M.F.Z.  (Ex. 14 at Castro 000096; Ex. 19 at Castro 000139.)  Respondent failed to appear with

24 Z.M.F.Z. at the September 8th hearing, but the Jalisco family court proceeded with the hearing

25 and the taking of evidence.  (Ex. 47 at Castro 000521.)  The Jalisco family court directed the

26 _____

27 [3] The Ninth Circuit has held that "[a] verified complaint may be treated as an affidavit to the extent that the
   complaint is based on personal knowledge and sets forth facts admissible in evidence and to which the

28 affiant is competent to testify."  *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985).

Mexican Central Authority to begin the process of returning Z.M.F.Z. to Mexico under the Hague Convention.  (Ex. 15 at Castro 000104-105.)

The Jalisco family court received a letter from respondent on September 13, 2017, stating that respondent had initially taken Z.M.F.Z. to the United States for a week, but that the two would now remain in the United States indefinitely.  (Ex. 19 at Castro 000139.)  The Jalisco family court issued an official written notice to the Mexican Office of Foreign Relations that respondent had left the country with Z.M.F.Z. and ordered the initiation of Hague Convention proceedings for the return of the child.  (Ex. 18 at Castro 000122.)  In this official notice, the court noted that respondent had removed Z.M.F.Z. from the country "notwithstanding the fact that the legal custody of [Z.M.F.Z.] is under legal dispute."  (*Id.*)  On May 8, 2018, the Jalisco family court revoked respondent's provisional custody and awarded petitioner custody of Z.M.F.Z.  (Tr. (ECF No. 47) 72-73; *see also* Ex. 25 at Castro 000172.)

Petitioner testified that she first learned that Z.M.F.Z. left Mexico for Las Vegas in September of 2017.  (Tr. (ECF No. 47) at 74.)  Based on the provisional custody order, petitioner assumed that Z.M.F.Z. was with respondent, and that it was not until Z.M.F.Z. did not return for the hearing that she knew respondent "had taken her."  (*Id.* at 75:5-8.)  Rufo testified that respondent is seeking asylum in the United States because she fears for her life in Mexico.  (*Id.* at 260.)

Petitioner initiated an application for the return of Z.M.F.Z., under the Hague Convention, on July 4, 2018, with the Jalisco family court judge named as the petitioner.  (Ex. 5 at Castro 000016.)  That application was returned for more information.  A complete application was then made to the Mexican Central Authority on August 20, 2018, which was then forwarded to the United States Department of State around August 23, 2018.  (Compl. (ECF No. 1-1) at 48.)  The petition was filed in this court on September 7, 2018.  (Compl. (ECF No. 1).)

Meanwhile, once in Las Vegas, respondent enrolled Z.M.F.Z. in the Ruben P. Diaz Elementary School on August 31, 2017, where Z.M.F.Z. continues to attend.  (Tr. (ECF No. 47) at 139, 238.)  Z.M.F.Z. testified that when she first started school she could not speak or read English well and that it was difficult for her to form friendships.  (*Id.* at 140-141, 152.)  But since

learning English, Z.M.F.Z. has made three friends and participates in activities during recess. (*Id.* at 141-142.) Z.M.F.Z. regularly interacts with family members that reside in Las Vegas, including her cousin, Ashley Cervantes Michel, aunt Graciela, and uncle Philbert. (*Id.* at 142-144.) Z.M.F.Z. testified she likes living with respondent and that she would prefer to remain in Las Vegas with respondent, because of school, her friends, and to learn English. (*Id.* at 139, 145.) When counsel questioned Z.M.F.Z. as to why she did not participate in the court-ordered visitation with petitioner on October 20, 2018, Z.M.F.Z. emotionally stated that she did not want respondent to "get in some trouble . . . after all that she has [done to take] care of [her]." [4] (*Id.* at 158-159.)

Z.M.F.Z.'s homeroom, math, and health teacher, Kathy Sauer, examined Z.M.F.Z.'s records and testified that Z.M.F.Z.'s English improved. (Ex. 9; Tr. (ECF No. 47) at 241.) Z.M.F.Z. entered school not speaking any English, and yet, ended the 2017-2018 school year with a proficiency score of 3.9. (Tr. (ECF No. 47) at 241; Ex. 9 at BHR000643.) Z.M.F.Z. will exit the English Language Learner program when she achieves a score of 4.5. (Tr. (ECF No. 47) at 241-42; Ex. 9 at BHR000644.) Z.M.F.Z.'s grades improved as she continued to learn English: her first semester grades included an 'F' and a few 'D's, among two 'A's and one 'C', but her second semester grades included one 'D', three 'C's, two 'B's and two 'A's. (Ex. 9 at BHR000665.) Z.M.F.Z. also received awards for her improved reading ability. (Tr. (ECF No. 47) at 244.)

Z.M.F.Z.'s cousin, Ashley Cervantes Michel, testified to Z.M.F.Z.'s relationship with respondent and Z.M.F.Z.'s life in Las Vegas. According to Michel, she maintains a sister-like relationship with Z.F.M.Z. (*Id.* at 171.) The two girls interact at least three times a week, where Michel often assists Z.M.F.Z. with her homework and English, accompanies Z.M.F.Z. to the movies, and plays board games with her. (*Id.* at 172, 176.) Michel also testified that Z.M.F.Z.

---

[4] This court granted petitioner visitation with Z.M.F.Z. from Saturdays at 9:00 a.m. to Sundays at 5:00 p.m., during the pendency of this case. (Mins. Proceedings (ECF No. 12).) Petitioner attempted visitation with Z.M.F.Z. on October 20, 2018, and Z.M.F.Z. initially agreed to leave with petitioner before subsequently changing her mind. (Mot. for Sanctions (ECF No. 26) at 4-5.)

1    and respondent maintain a healthy relationship.  (*Id.* at 173.)  According to Michel, Z.M.F.Z. also

2    has other family members that reside in Las Vegas.  (*Id.* at 175.)

3        The court heard testimony from Dr. Roitman, who the parties stipulated is an expert in

4    child psychiatry.  (*Id.* at 179.)  Dr. Roitman performed a three-hour psychiatric examination of

5    Z.M.F.Z., first with respondent and Elias, and then with Z.M.F.Z. alone. (Decl. of Norton A.

6    Roitman, MD, DLFAPA (Ex. 17) at ¶ 20.)   Dr. Roitman examined Z.M.F.Z.'s maturity level and

7    determined that she exhibited "at least an 8-year-old level of maturity, if not beyond there . . . ."

8    (Tr. (ECF No. 47) at 199.)  Dr. Roitman opined that Z.M.F.Z. has attained an age where it would

9    be appropriate to consider her wishes to remain in the country.  (*Id.* at 199-200.)

10       Dr. Roitman testified Z.M.F.Z. is "strongly attached to her grandmother" and that she

11   views respondent as her primary caregiver, like a mother.  (*Id.* at 186.)  Z.M.F.Z. has experienced

12   two traumatic injuries caused by the separation of her primary caregivers, her mother who

13   disappeared, and respondent.  (*Id.* at 219-220.)  Dr. Roitman testified that Z.M.F.Z. has no

14   ongoing psychiatric disorder, but exhibits avoidant anxiety resulting from being removed from

15   respondent.  (*Id.* at 190.)  Dr. Roitman attributed the cause of these symptoms to the three-month

16   separation between respondent and Z.M.F.Z., when Z.M.F.Z. lived with Raul and then with

17   petitioner in 2017.  (*Id.* at 190-193.)  Dr. Roitman testified that Z.M.F.Z. lives in constant fear

18   that the separation may occur again, and that the fear has manifested into the physical symptoms

19   of stomach pain, nausea, and vomiting.  (*Id.* at 192.)  Dr. Roitman further testified that Z.M.F.Z.

20   experiences nightmares when she anticipates visits with petitioner.  (*Id.* at 195.)  When asked

21   whether he "believe[s] with a reasonable degree of medical certainty that there is a grave risk that

22   [Z.M.F.Z.] will suffer psychological harm if she's separated again from her primary caregiver, her

23   grandmother," Dr. Roitman responded with "yes."  (*Id.* at 196, ¶ 20-24.)  Dr. Roitman continued,

24   stating that the bond between respondent and Z.M.F.Z. must continue and that the bond itself is

25   "more important than the location."  (*Id.* at 197, ¶ 1-6.)

26       Dr. Roitman prepared a report memorializing his examination of Z.M.F.Z. and concluded

27   that the child

28

is at grave risk and psychological harm because [she] remains vulnerable to relapse into much worse and prolonged stress reaction that would be compounded by her earlier tragic loss and her perception that she was removed from her grandmother and grandfather who she dearly loved.

(Decl. of Norton A. Roitman, MD, DLFAPA (Ex. 17) at ¶ 28.)  Dr. Roitman concludes that to prevent further exacerbation to Z.M.F.Z.'s symptoms, it is best for the child to remain in a "safe, secure, predictable and protected family environment in which she currently resides." (*Id.* at ¶ 30.)  Additionally, Dr. Roitman stated that the bond between respondent and Z.M.F.Z. must continue, even if that meant that the bond was to continue in Mexico.  (Tr. (ECF No. 47) at 196-97.)  Dr. Roitman also recommends counseling for Z.M.F.Z. to strengthen her feelings of trust towards petitioner.  (*Id.* at 223.)  During petitioner's re-direct examination, petitioner agreed to submit Z.M.F.Z. to individual therapy, if Z.M.F.Z. was to be in her care upon a return to Mexico. (*Id.* at 250-51.)

## II.    PROCEDURAL HISTORY

Petitioner initiated this case on September 7, 2018, by filing a complaint requesting the return of the child and an emergency petition for local authorities to take Z.M.F.Z. into protective custody pending the outcome of the case.  (Compl. (ECF No. 1); Emergency Petition (ECF No. 3).)  The court denied petitioner's emergency petition, but it entered a temporary restraining order prohibiting the removal of Z.M.F.Z. from the court's jurisdiction.  (Order (ECF No. 4).)  This court held a case-management conference on September 26, 2018 and granted petitioner visitation with Z.M.F.Z. from Saturdays at 9:00 a.m. to Sundays at 5:00 p.m., during the pendency this case.  (Mins. Proceedings (ECF No. 12).)  Meanwhile, respondent obtained temporary guardianship over Z.F.M.Z. from the Family Division of the Eighth Judicial District Court, Clark County, Nevada ("Clark County Family Court" or "Family Court") on September 27, 2018 and would not permit petitioner visitation.  (*See* Report and Recommendation (ECF No. 35) at 2 (where the court took judicial notice of the Clark County Family Court order).)

Petitioner then filed a motion for sanctions, alleging that respondent failed to comply with the court's visitation order during the weekends of September 28, 2018 and October 5, 2018. (Mot. for Sanctions (ECF No. 14) ¶ 2.)  The court heard arguments on the motion and took the

matter under advisement, but the court reiterated that its visitation order remained in effect and ordered respondent to comply.  (Mins. of Proceedings (ECF No. 25).)  Petitioner then filed a subsequent motion for sanctions, alleging that respondent had failed to facilitate visitation over the weekend of October 20, 2018.  (Mot. for Sanctions (ECF No. 26).)  The court heard arguments on this second motion for sanctions and once again took the matter under advisement.  (Mins. of Proceedings (ECF No. 34).)  The court issued a report and recommendation that the Nevada state court guardianship order be vacated and that any further custody proceedings be stayed.  (Report and Recommendation (ECF No. 35).)  The report and recommendation is pending before the United States district judge assigned to this case.

Petitioner now seeks the return of Z.M.F.Z. to Mexico for a custody determination by the Mexican courts, arguing that respondent wrongfully retained and removed Z.M.F.Z. from Mexico, her habitual residence, in violation of petitioner's custody rights.  Petitioner also seeks transportation expenses and costs under 22 U.S.C. § 9007.

Respondent seeks denial of the petition for return, arguing that the petition is time barred because it was filed more than a year after Z.M.F.Z. was removed from Mexico, and that the child is well settled in her new environment.  Respondent argues that Z.M.F.Z. is of sufficient age and maturity to object to return, and that return to Mexico exposes Z.M.F.Z. to a grave risk of psychological harm.

**III.    HAGUE CONVENTION**

Adopted in 1980, the Hague Convention is an international treaty that establishes procedures for the "prompt return of children wrongfully removed or retained in any Contracting State."  The United States enacted the International Child Abductions Remedies Act ("ICARA"), thus implementing the Hague Convention.  *See* 22 U.S.C. § 9001 *et seq*.  ICARA vests both states and federal courts with concurrent jurisdiction over Hague Convention claims.  *See* 22 U.S.C. § 9003(a).  The court applying the Hague Convention is tasked with resolving the petition according to the Convention, rather than issuing a custody determination.  *See* Hague Convention, art. 12, 19 I.L.M. at 1502; *see also Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010).  Decisions on where the child would be happy is a question reserved for the court in the country of

habitual residence. *See Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir. 2001) (stating that "[a] court that receives a petition under the Hague Convention may not resolve the question of who . . . is best suited to have custody of the child. With a few narrow exceptions, the court must return the abducted child to its country of habitual residence so that the courts of that country can determine custody."); *see also Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996).

The Hague Convention requires the return of a child whose removal or retention was wrongful. Hague Convention, art. 3, 19 I.L.M. at 1501. A wrongful removal or retention occurs when:

> a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> b) at the time of removal or retention those rights were actually exercised, . . or would have been so exercised but for the removal or retention.

*Id.* To establish a claim for return, a petitioner must prove: (1) the child was wrongfully removed or retained, (2) from his or her habitual residence, (3) in violation of petitioner's custody rights, and (4) the petitioner was exercising those rights. *Mozes*, 239 F.3d at 1070.

The petitioner has the burden of proving by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). Under § 9003(b), a petition for return of a child is properly heard by "any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." *See also Duarte v. Bardales*, 526 F.3d 563, 569 (9th Cir. 2009) (stating that "[a] person seeking the return of a child under the [Hague] Convention may do so by filing a petition in a court where the child is located.") (abrogated on other grounds by *Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014)). Under the Hague Convention, children are defined as persons under sixteen years of age. Hague Convention, art. 4.

If a petitioning party shows that the child was wrongfully removed, Article 13 of the Convention provides certain narrow exceptions to Article 12's mandate that the child be returned to her habitual residence. There are only five defenses available to a Hague Convention petition: 1) a one year delay in making the request for return, 2) the petitioner was not exercising custody at the time of removal, 3) the petitioner acquiesced to the removal, 4) return exposes the child to

grave risk of harm, and 5) the return violated the fundamental principles of human rights by the requested state. Hague Convention, art. 12, 13(b), 20, 19 I.L.M. at 1501-03. Defenses and exceptions to an order of return must be narrowly interpreted. *See Asvesta v. Petroutsas*, 580 F.3d 1000, 1004 (9th Cir. 2009). Here, respondent advances a one-year delay defense and a grave risk of harm defense. She also raises a mature-child objection under Article 13.

### A.    Jurisdiction

The Hague Convention is in force between Mexico and the United States. It is undisputed that Z.M.F.Z. was physically located in the District of Nevada at the time the petition for return was filed and that Z.M.F.Z. is younger than sixteen years old. The court therefore finds that it has jurisdiction to determine this case for return under the Convention. The parties are advised, however, that this recommendation is not a determination of the merits of any custody issues within the meaning of the Hague Convention. *See Cuellar*, 596 F.3d at 508.

### B.    Petitioner's Case-in-Chief

The parties do not dispute that Mexico was Z.M.F.Z.'s place of habitual residence until respondent removed Z.M.F.Z. to Las Vegas in August of 2017. The court therefore finds that Z.M.F.Z.'s habitual residence at the time of retention was Mexico.

Turning to petitioner's custody rights, the court must determine whether petitioner had custody rights and was exercising those rights at the time of removal. Petitioner argues that she maintained custody rights of Z.M.F.Z. until respondent removed her from the country. The Hague Convention distinguishes "rights of custody" from "rights of access." Hague Convention, art. 5, 19 I.L.M. at 1501. Rights of custody are the "rights relating to the care of the person of the child." *Id.* Whereas, rights of access are "the right to take a child for a limited period of time to a place other than the child's habitual residence." *Id.* The ICARA defines rights of access as "visitation rights." 22 U.S.C. § 9002(7). The law of the country in which the child was a habitual resident before removal determines custody rights. *Id.* Custody rights may be established by 1) operation of law, 2) judicial decision, or 3) agreement of the parties. *Id.* Whether a parent was exercising her custody rights has been liberally construed to include whenever a parent "keeps, or seeks to keep, any sort of regular contact with his or her child." *Friedrich*, 78 F.3d at 1065.

Here, respondent does not dispute that petitioner had custody rights and was exercising those rights at the time of wrongful retention. Petitioner and her father, Raul, initiated custody proceedings in May of 2017 against respondent. The court then awarded custody to Raul, who then informally passed on his custody of Z.M.F.Z. to petitioner upon his arrest. During the time Raul retained custody of Z.M.F.Z., petitioner hosted Z.M.F.Z. on the weekends and occasionally on the weekdays, and Z.M.F.Z. accompanied petitioner and her family on various family outings. Further, following Raul's arrest, petitioner retained physical custody of Z.M.F.Z., where Z.M.F.Z. resided with petitioner until respondent was awarded provisional custody on August 11, 2017, for the sole purpose of obtaining a psychological evaluation. Thus, the court finds that petitioner had custody rights and was exercising those rights at the time respondent absconded from the Mexican court's jurisdiction and wrongfully retained Z.M.F.Z. Accordingly, the court finds that petitioner has established by a preponderance of the evidence a claim for return of Z.M.F.Z. to Mexico under the Hague Convention.

### C.     Affirmative Defenses

Given that petitioner has established her claim for return, Z.M.F.Z. must be returned to Mexico unless respondent can establish her delay or mature child defenses by a preponderance of the evidence or her grave-risk defense by clear and convincing evidence. Specifically, respondent argues these proceedings were initiated more than a year after Z.M.F.Z. was removed from Mexico, and that Z.M.F.Z. is now well-settled in her new environment. (Sealed Trial Brief (ECF No. 41) at 2-3.) Respondent argues that Z.M.F.Z. is of sufficient age and maturity and objects to a return. (*Id.*) Finally, respondent argues a return to Mexico exposes Z.M.F.Z. to a grave risk of harm. (*Id.*) Having reviewed and considered the evidence, the court finds that respondent has not established a defense to return under the Hague Convention. For the following reasons, the court will recommend that Z.M.F.Z. expeditiously be returned to Mexico, her habitual residence, enabling the Mexican courts to assess issues relating to custody and Z.M.F.Z.'s best interests.

//

//

//

1          1.     Untimely Petition and Well-Settled Defense

2          A defense of delay requires a showing by the preponderance of the evidence that a) the

3   petitioner has delayed more than one year in the filing of an application for return and b) that the

4   child has become settled in her new environment.  Hague Convention, art. 12, 19 I.L.M. at 1502.

5                              a. Untimely Petition

6          The one-year limitation is calculated from the date of the wrongful removal or wrongful

7   retention to the commencement of the proceedings.  *See id.*  In cases of wrongful retention, the

8   clock begins to run either from the date the child remains with the abductor or when the acts of

9   the abductor are so unequivocal that the other party knew, or should have known, that the child

10  would not be returned.  *Compare Blackledge v. Blackledge*, 866 F.3d 169, 178 (3d Cir. 2017),

11  cert. denied, 138 S. Ct. 1449 (2018); *and Karkkainen v. Kovalchuk*, 445 F.3d 280, 290 (3d Cir.

12  2006); *with In re Ahumada Cabrera,* 323 F. Supp. 2d 1303 (S.D. Fla. 2004).  ICARA provides

13  the term "commencement of the proceedings" means the date on which the petition is filed in

14  court.  22 U.S.C. § 9003(f)(3).  The Supreme Court concluded that the one-year period is not

15  subject to equitable tolling in Hague proceedings.  *Lozano v. Montoya Alvarez*, 572 U.S. 1, 19

16  (2014).  While the Convention aims to deter abductions, "the Convention does not pursue that

17  goal at any cost" and recognizes that the remedy of return may be overcome.  *Id.* at 16.

18  Additionally, the Hague Convention does not limit the court's authority in ordering return despite

19  the expiration of the one-year rule.  *Id.* at 19-20 (Alito, J., concurring); *see also* Hague

20  Convention, art. 18, 19 I.L.M. at 1503 ("The provisions of this Chapter do not limit the power of

21  a judicial or administrative authority to order the return of the child at any time.").

22         Here, respondent was awarded provisional custody of Z.M.F.Z. from August 11 to August

23  18, 2017 to obtain a psychological report.  After she failed to do so, the Jalisco Family Court then

24  extended the provisional custody until September 8, 2017 to allow respondent to comply.

25  However, respondent continued to retain custody of Z.M.F.Z. and had removed Z.M.F.Z. from

26  the country in August of 2017.  Though petitioner informed the Jalisco Family Court that

27  respondent had left the country on August 30, that court proceeded with the September 8, 2017

28  custody hearing.  Further, the Jalisco Family Court then received a letter from respondent, on

September 13, 2017, informing the Jalisco Family Judge of her intent to permanently remain in the United States with Z.M.F.Z.  In light of these facts, respondent's failure to appear at the court-ordered hearing on September 8, 2017, was the earliest unequivocal act when petitioner should have known that respondent had wrongfully retained Z.M.F.Z.  Alternatively, respondent's intent to remain in Las Vegas was unequivocally clear upon receipt of her letter on September 13, 2017.  Petitioner filed the underlying Hague Convention petition on September 7, 2018, less than a year after respondent's failure to appear at the September 8, 2017 hearing.  Therefore, the court finds the petition timely.

### b. Well-Settled

Respondent argues that the six factors from *In re B. Del C.S.B.* weigh in favor of Z.M.F.Z. remaining in Las Vegas, Nevada.  *See* 559 F.3d 999, 1009 (9th Cir. 2009).  First, respondent argues that Z.M.F.Z. is an "extremely mature and intelligent eight-year-old girl."[5]  (Sealed Trial Brief (ECF No. 41).)  Respondent further argues that Z.M.F.Z. enjoys a safe and stable environment in Las Vegas, attends school consistently, has friends and relatives in the area, and participates in extracurriculars.  Lastly, respondent claims that she is financially stable and can support Z.M.F.Z. here in Las Vegas.  Petitioner disputes that Z.M.F.Z. is well-settled, arguing that Z.M.F.Z. has not established any significant connections to the United States, and that respondent has not demonstrated that she is financially capable of providing for Z.M.F.Z.  (Pet.'s Post-Trial Brief (ECF No. 48) at 2.)

The term "settled" is construed as emotional and physical connections in the new environment that demonstrates "security, stability, and permanence . . . ."  *Lozano v. Alvarez*, 697 F.3d 41, 56 (2d Cir. 2012); *Duarte v. Bardales*, 526 F.3d 563, 569-70 (9th Cir. 2008) (abrogated on other grounds by *Lozano v. Montoya Alvarez*, 572 U.S. at 10).  Whether the child has settled in a new environment is a fact-intensive assessment.  *See Yaman v. Yaman*, 730 F.3d 1, 21 (1st Cir.

---

[5] Recognizing that respondent also advances a stand-alone age and maturity defense, the court will address the defense separately.

2013).  The court considers the following factors to determine whether the child has significant connections to the new country:

> 1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability.

*In re B. Del C.S.B.*, 559 F.3d at 1009.  The most important factor is the stability and length of time in the new environment.  *Id.*  The court may consider the immigration status of the child and the respondent, if there is "an immediate, concrete threat of deportation."  *Id.*  There may be factors that outweigh a well-settled finding, including the child's interest, the need to discourage inequitable conduct, and to deter abductions.  *Montoya Alvarez*, 572 U.S. at 20 (Alito, J., concurring); *Wojcik v. Wojcik*, 959 F. Supp. 413, 420–21 (E.D. Mich. 1997) (suggesting that there may be equitable reasons to order a child returned despite being settled).

Respondent presented evidence from Z.M.F.Z., her cousin, Ashley Michel, and her teacher, Kathy Sauer, to demonstrate that Z.M.F.Z. is well-settled in Las Vegas.  The evidence demonstrates that Z.M.F.Z. has attended the same elementary school since moving to the United States, and her that English skills have significantly improved.  Z.M.F.Z. has made friends in her new environment, including three best-friends, and she enjoys participating in school activities and has won school awards.  According to Sauer, Z.M.F.Z.'s academic performance demonstrates improvement correlating to her continued mastery of the English language.  Michel testified that Z.M.F.Z. has relatives that reside in the Las Vegas area.  Additionally, Michel testified that she often spends time with Z.M.F.Z. by helping her with her homework, and that the pair enjoy watching movies.  Respondent did not present evidence of her financial stability and employment; thus, this factor is neutral.  Regarding the parties' immigration status, Z.M.F.Z. is a dual citizen of Mexico and the United States.  Respondent's son, Rufo, testified that respondent is seeking asylum in the United States.

Based on the evidence presented, the court finds that Z.M.F.Z. is well-settled.  Although she has only been in Las Vegas for a little over a year, Z.M.F.Z. has established significant

1    connections to Las Vegas, as she has developed friends, attends school regularly, and has family

2    that resides in the area.  While the parties presented limited evidence of respondent's immigration

3    status, there is no basis to believe that she faces an immediate threat of deportation.  Further,

4    Z.M.F.Z. is a dual citizen of Mexico and the United States.  Though respondent has demonstrated

5    by preponderance of the evidence that Z.M.F.Z. is well-settled in her new environment,

6    petitioner's Hague Convention petition was timely filed.  Therefore, the court finds that

7    respondent has not established her untimely petition and well-settled defense by a preponderance

8    of the evidence.

9                    2.        Mature Child Defense

10        Respondent also argues Z.M.F.Z. has reached sufficient age and maturity, allowing her to

11   object to return.  The Hague Convention recognizes that the court may refuse to order the return

12   of a child that "has attained an age and degree of maturity at which it is appropriate take account

13   of its views."  Hague Convention, art. 13, 19 I.L.M. at 1502.  The district court must make a

14   finding that the child objects to being returned and that the child is "sufficiently mature for those

15   views to carry weight." *Gaudin*, 415 F.3d at 1037.  Such a determination requires caution to

16   ensure that the child's statement reflect their beliefs, rather than that of the absconding guardian

17   or individual.  *See id.* n.3.

18        Here, Z.M.F.Z. was called as a witness during the evidentiary hearing and testified to her

19   age of eight, and her objections to returning to Mexico.  When asked by respondent's counsel

20   why she does not want to return to Mexico, Z.M.F.Z. stated that she wishes to remain in the Las

21   Vegas because of her school, her friends, and to learn English.  Further, Dr. Roitman testified to

22   Z.M.F.Z.'s maturity level, concluding that she exhibits the maturity of at least an eight-year-old

23   child.

24        Based on the evidence, the court does not find respondent has demonstrated by a

25   preponderance of the evidence that Z.M.F.Z. has "exhibit[ed] an unusual degree of maturity and

26   situational awareness" to accord her wishes "significant weight."  *Blackledge*, 866 F.3d at 187.

27   While Z.M.F.Z. readily answered respondent's counsel's questions, Z.M.F.Z. had difficulty

28   communicating and recalling events when questioned by petitioner's counsel.  Further, when

1    petitioner's counsel questioned Z.M.F.Z. as to why she changed her mind on participating in

2    visitation, Z.M.F.Z. emotionally expressed concern that respondent would be harmed.  Given

3    Z.M.F.Z.'s emotional response, the court is not convinced that Z.M.F.Z.'s views are her own and

4    not a result of influence from respondent.  Having weighed the evidence and arguments

5    presented, the court finds that respondent has not demonstrated a mature-child defense by a

6    preponderance of the evidence.

7                    3.        Grave Risk Defense

8              Respondent argues that returning Z.M.F.Z. to Mexico will expose her to physical or

9    psychological harm.  (Sealed Trial Brief (ECF No. 41) at 14-15.)  Specifically, that Z.M.F.Z.

10   experiences anxiety symptoms when separated from respondent, and that separation would place

11   her at grave risk of relapse.  (*Id.*)  Respondent presents argument of counsel that returning

12   Z.M.F.Z. would expose the child to contact with Raul's family, who are allegedly "members of

13   one of the largest drug cartels in Mexico."  (*Id.* at 15.)  According to respondent, petitioner's

14   immediate family members were designated by the United States Government as narcotics

15   traffickers under the Drug Kingpin Act.  (*Id.* at 15-16.)  Lastly, respondent argues that Raul, the

16   alleged leader of the cartel, is still actively seeking custody, and thus exposes Z.M.F.Z. to harm.

17   (*Id.* at 17.)

18             Petitioner disputes the claims of grave risk of harm to Z.M.F.Z., arguing that Z.M.F.Z.

19   will not be exposed to criminal activity upon return to Mexico.  (Pet's Post Trial Brief (ECF No.

20   48) at 2.)  Petitioner testified that her and her husband have a clean record, and no connection to

21   the allegations against her father, Raul.  (Tr. (ECF No. 47) at 32, 62, 68.)  Petitioner further

22   argues that Z.M.F.Z.'s bond with respondent is not a sufficient basis for Z.M.F.Z. to remain in

23   Las Vegas.  (Pet's Post Trial Brief (ECF No. 48) at 3.)

24             Under the Hague Convention, the court need not order return, even if wrongful removal

25   has occurred, if "there is a grave risk that his or her return would expose the child to physical or

26   psychological harm or otherwise place the child in an intolerable situation."  Art. 13(b), 19 I.L.M.

27   at 1502.  This exception is narrowly construed, and the burden remains with the respondent to

28   prove by clear and convincing evidence a grave risk defense.  22 U.S.C. § 9003(e)(2)(A); *Gaudin*,

415 F.3d at 1035.  Notwithstanding a well-established grave risk defense, the court may exercise discretion and order the return of the child.  *Asvesta,* 580 F.3d at 1004.

A determination of grave risk is a question of fact and law.  *See Cuellar*, 596 F.3d at 505.  The grave-risk exception requires the court to consider "whether the child would suffer serious abuse that is a great deal more than minimal."  *Gaudin*, 415 F.3d at 1035 (quotations omitted).  The grave-risk exception applies "only in extreme cases" and does not allow the court to make value judgments regarding disparate economic conditions, lifestyles, or parenting styles and "is not license for a court in the abducted-to country to speculate on where the child would be happiest."  *Cuellar*, 596 F.3d at 508-09.  A grave risk of harm exists "when return of the child puts the child in imminent danger prior to the resolution of the custody dispute—e.g., returning the child to a zone of war, famine, or disease" or when there is "serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection."  *Friedrich*, 78 F.3d at 1069 (indicating that sexual abuse of a child would constitute an intolerable situation).  Proof of grave risk of harm requires "specific evidence of potential harm" to children.  *Rydder v. Rydder*, 49 F.3d 369 (8th Cir. 1995).

Other district courts and circuits have found a grave risk of harm in cases where the harm is a result of separation or disrupting the bond between the abductor and the child.  *See Rydder*, 49 F.3d at 373; *Steffen F. v. Severina P.*, 966 F. Supp. 922, 927-28 (D. Ariz. 1997).  The Ninth Circuit, however, has not squarely addressed the issue, but has held that allowing an exception to return based on the trauma inflicted on a young child contravenes the Hague Convention's rule of return.  *Asvesta*, 580 F.3d at 1020-1021.  The court in *Asvesta* recognized that a grave risk of harm must be more than what is expected when separating the child from a caregiver and passing her to another.  580 F.3d at 1021.  Grave risk of harm is where "the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation."  *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001).

Here, respondent's expert, Dr. Roitman, testified that Z.M.F.Z. exhibits anxiety and avoidant symptoms that are exacerbated by separation from Z.M.F.Z.'s primary caregiver,

1    respondent.  Dr. Roitman testified that the grave risk of psychological harm will only occur if

2    Z.M.F.Z. is separated from respondent.  (Tr. (ECF No. 47) at 196, ¶ 20-24.)  Dr. Roitman

3    cautioned that the bond between respondent and Z.M.F.Z. must continue, even if that meant that

4    the bond was to continue in Mexico.  (*Id.* at 196-97.)  Lastly, petitioner testified that neither her

5    nor her husband have a criminal record and have no ties to the allegations against her father, Raul.

6    (*Id.* at 32, 62, 68.)  Petitioner also did not express any concern that Z.M.F.Z. would be exposed to

7    danger.  (*Id.* at 69-70.)

8        Respondent has not established by clear and convincing evidence that Z.M.F.Z. will be

9    subject to a grave risk of serious harm from returning her to Mexico.  Respondent has only

10   demonstrated that the possible grave risk of harm is attributed to the separation of Z.M.F.Z. from

11   respondent.  Dr. Roitman himself provided a solution to eliminate such a risk of harm, by stating

12   that the bond between Z.M.F.Z. must continue, even if Z.M.F.Z. is returned to Mexico.

13   Additionally, respondent has not presented clear and convincing evidence that petitioner's alleged

14   ties to a drug cartel via family relationships expose Z.M.F.Z. to a grave risk of physical or

15   psychological harm.  The alleged leader of the drug cartel, Raul, is not the petitioner seeking the

16   return of Z.M.F.Z., and neither petitioner nor her husband are facing charges in relation to the

17   cartel.  Nor is there evidence of neglect or abuse in this case.  Thus, there is no evidence

18   indicating that Z.M.F.Z. would be exposed to imminent harm pending the Mexican court's

19   resolution of the custody dispute.  Given that respondent has not established a grave-risk defense

20   by clear and convincing evidence, the court will recommend that Z.M.F.Z. be returned to Mexico.

21        **D.    Conclusion**

22        Having weighed all of the evidence, the court finds that respondent has not established her

23   delay or mature child defenses by a preponderance of the evidence nor her grave-risk defense by

24   clear and convincing evidence.  The court will therefore recommend that Z.M.F.Z. be returned to

25   Mexico for the appropriate Mexican court to make a final custody decision.  Given Dr. Roitman's

26   compelling testimony of the bond between respondent and ZM.F.Z., the court will recommend

27   that Z.M.F.Z. be returned to Mexico in the care of respondent.  Respondent is advised that the

28   court's previous orders that respondent must not remove Z.M.F.Z. from the District of Nevada

1    pending the outcome of this case remain in effect.  Respondent is further advised that the court's

2    visitation order remains in effect pending the outcome of this case.

3    **IV.    MOTION TO SEAL**

4           Respondent moves the court to seal her pre-trial and post-trial briefs, arguing that the

5    filings include information regarding Z.M.F.Z.'s medical examination.  (Mot. to Seal (ECF No.

6    42); Mot. for Leave to File Post-Trial Brief Under Seal (ECF No. 49).)  Generally, the public has

7    a right to inspect and copy judicial records. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d

8    1172, 1178 (9th Cir. 2006).  Such records are presumptively publicly accessible.  *Id.*  An

9    exception exists for "[a] narrow range of documents" that are "traditionally . . . kept secret for

10   important policy reasons."  *Id.*  Consequently, a party seeking to seal a judicial record bears the

11   burden of overcoming this strong presumption with compelling reasons.  *Id.*  The court then

12   balances the interests of the public and the interests of the moving party.  *Id.*  Among the

13   compelling reasons which may justify sealing a record is "when such court files might have

14   become a vehicle for improper purposes . . . ."  *Id.* at 1179 (quotation omitted).  Exposure to

15   embarrassment, incrimination, or further litigation, are not compelling reasons to seal a record.

16   *Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1122, 1136 (9th Cir. 2003).  Under Rule 5.2 of

17   the Federal Rules of Civil Procedure and Local Rule IC 6-1, parties should partially redact

18   personal-data identifiers from court filings.  Personal-identifiers include social security numbers,

19   names of minor children, dates of birth, financial account numbers, home addresses, and tax

20   identification numbers.  LR IC 6-1.

21          Here, respondent moves to seal the entirety of her pre-trial brief, post-trial brief, and

22   accompanying exhibits, even though the "sensitive" information accounts for a minimal portion

23   of the filings.  Under *Kamakana*, respondent must demonstrate compelling reasons as to why

24   each filing should not be publicly accessible.  447 F.3d at 1178.  Having reviewed the filings, the

25   court is not convinced that respondent's pre-trial and post-trial briefs should be filed under sealed.

26   Respondent has redacted most of the personal identifiers, except for Dr. Roitman's declaration.

27   Further, respondent put the claim of psychological harm to Z.M.F.Z. is at issue in this case, and

28   thus the court finds no reason why the evaluation should be sealed.  The court also notes that

Z.M.F.Z.'s identity is protected given that she is referred to only by her initials in the filings in this case. The court therefore will deny the motions to seal without prejudice.

Nonetheless, the court will allow the filings to remain sealed temporarily to allow the parties to meet and confer about what, if any, portions of the motion and its exhibits should be sealed. If any party determines that any portion of the exhibits should remain sealed, that party must file a motion to seal along with a proposed redacted version of the filing for the public record within 21 days of the date of this order. Any motion to seal must comply with the Federal Rules of Civil Procedure, the court's local rules, and *Kamakana*.

## V.    MOTION TO STRIKE

Petitioner moves to strike a portion of respondent's post-trial brief and appendix, arguing that respondent's brief exceeds the court-ordered five-page limit and is untimely. (Emergency Mot. to Strike (ECF No. 52).) Petitioner also requests attorney's fees for the filing of this emergency motion. (*Id.*) Respondent responds that petitioner failed to meet and confer before filing an emergency motion, and that her brief was properly filed. (Resp. (ECF No. 53).) On reply, petitioner reiterates the arguments from her motion and states a meet-and-confer conference was unnecessary because respondent had already filed the non-compliant brief. (Reply (ECF No. 54).)

Respondent's post-trial brief does not comply with the court's order. (*See* Mins. of Proceedings (ECF No. 46); *see also* Tr. (ECF No. 47) at 264, ¶ 13.) At the end of the evidentiary hearing on November 9, 2018, the court granted petitioner's request for the parties to submit post-trial briefs. (Tr. (ECF No. 47) at 261-64.) The court instructed the parties that the briefs should not exceed more than five pages and that the briefs should only be "very, very narrowly focused . . . ." (*Id.* at 262, ¶ 17-18.) Respondent's brief is nine pages, not including her 109-page appendix. (ECF Nos. 50, 51.) While respondent argues that the "substantive portion" of the brief is only "5.75 pages long," the filing still exceeds the page limit imposed by the court. (Resp. (ECF No. 53) at 5.) The court did not expressly discuss the filing of exhibits nor set a time that briefs should be filed. However, the court was clear that the briefs themselves needed to be "brief" and fewer than five pages.

Under the court's Local Rules, an emergency motion need not include a certification that the parties met and conferred, if the nature of the emergency precludes an opportunity to meet and confer. LR 7-4. While respondent argues that petitioner failed to meet and confer before the submission of this motion, the court finds that a meet and confer was precluded by the fact the non-compliant brief already had been filed. The court further finds it was appropriate for petitioner to file the motion on an emergency basis given the time constraints on the resolution of this case.

Given that respondent failed to comply with the court's order and conceded that her brief is in excess of the court's five-page limit, the court will grant petitioner's motion to the extent it will not consider the arguments raised beyond the first five pages of the brief. The court will also grant petitioner's request for reasonable attorney's fees, to be paid by respondent's counsel. The parties must meet and confer on amount of attorney's fees. If they are unable to reach an agreement, petitioner may file a motion for attorney's fees that complies with Local Rule 54-14 within 30 days from the date of this order.

## VI.    RECOMMENDATIONS AND ORDER

IT IS THEREFORE RECOMMENDED that the court:

1. GRANT petitioner Carmen Castro Flores' Verified Complaint and Petition for Return of Children to Petitioner (ECF No. 1);

2. ORDER that respondent Bertha Hernandez Renteria return to Mexico with Z.M.F.Z. within fourteen days from the entry of the order;

3. ORDER that upon return to Mexico, respondent must submit to the Mexican court with jurisdiction over the custody dispute for resolution of custody and related issues. The parties are reminded that this recommendation is not a determination of the merits of any custody issues within the meaning of the Hague Convention. Those issues are left to the appropriate Mexican court.

4. ORDER that the parties meet and confer regarding travel arrangements for respondent and Z.M.F.Z.'s return to Mexico;

5.  ORDER that an additional hearing be set to finalize the time, manner, date, and other transportation arrangements of Z.M.F.Z.'s return to Mexico and incorporate them in an order of return;

6.  ORDER that petitioner, upon her return to Mexico, continue to submit to the Mexican court with jurisdiction over the pending custody proceedings for resolution of custody, visitation, and related issues.  The parties are reminded that this recommendation is not a determination of the merits of any custody issues within the meaning of the Hague Convention.  Those issues are left to the appropriate Mexican court.

IT IS FURTHER RECOMMENDED that petitioner's request for transportation costs and fees be DENIED pending the filing of a motion that complies with Local Rule 54-14.

IT IS FURTHER ORDERED that is respondent's motions to seal (ECF Nos. 42, 49) are DENIED without prejudice.

IT IS FURTHER ORDERED that the documents filed at ECF No. 42 and ECF No. 49 will remain under seal pending further court order.

IT IS FURTHER ORDERED that the parties must meet and confer about what, if any, portions of the documents should be sealed.  If any party determines that any portion of the exhibits should remain sealed, that party must file a motion that complies with the instructions in this order.

IT IS FURTHER ORDERED that if a motion to seal is not filed by any party within 21 days of the date of this order, the documents at ECF No. 42 and ECF No. 49 will be unsealed without further notice.

IT IS FURTHER ORDERED that petitioner's motion to strike (ECF No. 52) is GRANTED in part as stated in the report and recommendation.

IT IS FURTHER ORDERED that if the parties are unable to reach an agreement regarding attorney's fees, petitioner may submit a motion for attorney's fees for the preparation of the emergency motion to strike (ECF No. 52) within 30 days of this order, in accordance with Local Rule 54-14.

//

1    IT IS FURTHER ORDERED that respondent must not remove Z.M.F.Z. from the District

2  of Nevada pending the final resolution of this case.

3  **VII.    NOTICE**

4    This report and recommendation is submitted to the United States district judge assigned

5  to this case under 28 U.S.C. § 636(b)(1).  A party who objects to this report and recommendation

6  may file a written objection supported by points and authorities within fourteen days of being

7  served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely

8  objection may waive the right to appeal the district court's order.  *Martinez v. Ylst*, 951 F.2d

9  1153, 1157 (9th Cir. 1991).

10    DATED: November 29, 2018

11

12

13                    C.W. HOFFMAN, JR.
                     UNITED STATES MAGISTRATE JUDGE
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28